Good morning, ladies and gentlemen of the panel, this Honorable Court. I'm Douglas DeVries, on behalf of Appellant Sam Schmidt. Our position is that the judgment below, entered against Mr. Schmidt, must be reversed because of error that resulted in him being deprived of his rights under Federal law, in particular, the McCarran-Ferguson Act, and also the McCarran-Ferguson Act, as we put in the brief, compels State regulation of insurance and mandates that the States regulate insurance. And one of the issues in this case raised by Appellee Lloyds is that they are not subject to regulation. And that would be an end-run around the McCarran-Ferguson Act, an act which, under State law, the Nevada statutes control the insurance policy that was sold to Mr. Schmidt, a Nevada citizen, and accepted premium from Nevada. And that implicates the jurisdiction and authority of the State to regulate insurance.  Kagan. Kagan. Kagan. DeVries, let me ask you a slightly different question, putting the McCarran-Ferguson Act aside. And let's just assume that the Nevada statutes all apply. Assume it. Here,  term. And you had an offer of renewal. You had also a statement that by Schmidt that he didn't then want to go forward, and that he would get back to the state to grow on when he got a contract. So what difference do any of the Nevada statutes make, given those facts? Under the Nevada statutes, and, in fact, under the terms of the policy, the policy – I'm sorry? I'm sorry. Oh, I'm sorry. I thought I heard you. The – under the terms of the policy in the Nevada statute, this is a renewable policy. There's no question about that. It's a renewable policy. It cannot be canceled. It cannot be not. But the point is, it wasn't canceled. There was an offer of renewal. It cannot be non-renewed except in conformity with the Nevada statutes. And until the statutes are complied with, the policy remains in force. But you're – see, here, focus on this, and then explain backwards for me. There was an offer of renewal, and your client rejected it. All right. Well, the trial court concluded that as a factual matter, which is a material disputed fact, as a matter of law, and there was no basis to do so, for these reasons. All right. Number one, there is no evidence that Mr. Schmidt declined renewal. What you have is a circumstance, as the record reflects, where Gorslein, the broker, sends three documents as part of a renewal offer. An offer of renewal in a letter, a price quote with a list of – of coverages that repeated the existing coverages, and third, a premium bill. What Mr. Schmidt returned was simply the – the premium bill itself with a circle around the amount of the premium with a statement scribbled on it that said, I don't have a contract. I will call you. Now, this – I will call you. This is not a denial or – or a rejection of a renewal as a matter of law. And further, I – I believe, Your Honor, it has to be considered in the context in which it was not 60 days before the end of the initial term of the insurance, a fax is sent over saying, Lloyd's is agreeing to renew, there's an increase in premium, okay? Get back to me, quote, as soon as possible, close quote. There is no deadline on the response communicated to Mr. Schmidt. In addition, on the premium bill, where the circle in the note appeared, if you look at that, what it says at the bottom is, please make out a check for that amount and mail it. Now, this is the day before, the last day of the initial policy term, so clearly there was no contemplation on the part of Gors' line that they were going to receive an acceptance or that they were going to receive a premium payment prior to the next day of the fourth, because there were no terms set out to be accepted. In that context, given the history of the policy, which was, as you recall, that the policy was issued in 1999 for a period back to January, starting January 5 of 1999, on which the premium was not paid, the 14,000 initial premium. That's just not correct. I mean, the premium was paid by Treadwell within 10 days by Treadwell, and the coverage was renegotiated downward later. Also, the motor, what is it, motor sports, I've forgotten the name of it, the motor sports proposal form was, in fact, returned before coverage was bound for the 1999 policy. That's right. There was an evidence of coverage sent, not never the policy. But my point being that the course of the relationship, including the very terms of the renewal offer, were not conditioned on receipt of premium on a specific day when he circled this and sent it back. And it said at the bottom, which he had a right to rely on, it will remain open for 30 days, which would have taken it out to at least February 2nd or 3rd. Yeah. Just so we're on the same track, I don't think this is a question of returning the premium. I mean, it's a question of accepting the offer that was made in the facts, which was to put the policy, the new policy and the new premium in force by January 5th. There had to be a return of the renewal form and approval of the plan. And neither of those happened. Indeed, the handwritten note explicitly says not now. That's the heart of the question. That's where I'm aiming you at, for the purpose of getting your response. I do not believe you can divorce that from the statement that says, I don't have a contract. I will call. I will call to discuss. That's the point. Sotomayor, let's just assume for the moment that the contract was not accepted and was not rejected, that as you say, he said, I will call and that's where we are. Right. That you have an offer. You said, I'll get in touch with you, not now. And you have an offer which says what it says. Then you have an accident. Where are we? Well, the policy and, again, all the questions that Judge Reimer just posed were also assumed, which I think is correct, that the Nevada law applies. Therefore, the policy remains in force. The premium issue is a red herring in the sense that that policy --- It's an acceptance, not a rejection. Because it says by its terms that the period of insurance is the initial term plus any additional terms we may agree upon, and that is further informed by the policy term that says it conforms with State law, and is further informed by the fact that Nevada law is very directly states that the effective end of the policy, or the effective end on the renewal of the policy, is conditioned on specific notice to the insured at a minimum of 30 days, and if it's renewal on different terms, which this is, 60 days. And that is consistent with what the Gors' line proposal was, which was this will remain open for 30 days. And, therefore, if there was never a premium paid in those 30 days, the policy is still in force. Mr. Smith's unfortunate injuries occurred very early in that process, certainly within those 30 days, and the policy remained in force, both by its terms, the offer, and by Nevada insurance code. It just never lasts. I don't see or understand how you can read a policy that says it's from January 5 to January 5. Is anything other than setting a term? Well, let me go for as we indicated in the brief, and when you look at the policy face sheet, which is on the record at page 90 on the Smith's exterior record, quote, the period of insurance, this insurance shall be effective from 5th January 1999 to 4th January 2000, and for such further periods as may be mutually agreed upon. Which there were not. That is the whole point. No, but it's a renewable policy, and then the whole thing turns on having to find below, as a matter of law, no reasonable minds could differ, that that circle and that note constitute an unequivocal rejection of a renewal offer. No, not a rejection. Where do you find in just forgetting State law for a moment, where do you find in the provision that you see? I've heard you say that if it's mutually agreed to extend, and I've heard you say that the offer isn't rejected, but are you saying there's a mutual agreement to extend? Once the extensions required have expired, if there had not been an agreement to renew, then the policy would not have been renewed, but it remains in force past the one-year term until the period of renewal expires. And it never expires. Hold on. All right. Why does it remain in force past January 4th? You say the period of renewal. Is it – are you relying on the insurance contract or the State statute to say that it remained in force past January 4th? The policy, by its conformity provision, incorporates and states that it is automatically amended by the statutes. Therefore, the statutes must be considered part of the policy. And by those, as we've said, on nonrenewal, that the period is extended under the statutes, and they're both – they're cited. For a period of 30 days, if there is a nonrenewal … You're not talking about what the contract says. You're talking about what the statute says. There is no – other than what I've stated, there is no further language in the policy other than the conformity provision that directly addresses renewal. What conformity provision? The conformity provision in the statute, which is a mandatory provision under the … The statute or in the policy? This is in the policy. This is in conformance with the statute. Is that correct? All it is, it relates to the statute. So your argument is statutory that it was in effect. Correct. I mean, you bootstrap that in by the conformity clause in the contract, but that's the only – if the statute doesn't mean what you say it means, then you lose that point. The policy is not in effect, right? Right. But under Daniels and the statutes, absent notice of nonrenewal on a renewable policy, or absent notice of cancellation, the policy remains in force for the minimum statutory periods. And that's what we have here. And I – and the – If you don't have a nonrenewal notice. If I may, just – I don't think I'm bootstrapping. What I'm doing is saying that where the policy says it is – All I'm saying is we're trying to define discrete issues here. You have an issue that's statutorily based on whether or not the Nevada statutes keep this policy in effect during the period, right? Right. And that only comes into the policy by virtue of the conformity clause, right? Right. Okay. If you leave all that aside, if you say Nevada statutes assume hypothetically that the Nevada statutes afford you no relief, then you're back to an offer acceptance, right? And on – yes. You're back to that, and there is a material question of fact that should not have been resolved as a matter of law. Yes. Well, that's what I'm getting to. Let's forget the Nevada statutes and what implication they might have for the policy. What is your best argument that you have a genuine issue of material fact as to whether or not this policy was renewed and effective as of the accident? One, it's a cryptic, ambiguous note that was written by a person who just received notice on the last day of the initial policy term who was just leaving that evening to go on the Indy racing circuit and had a lot to do. And – and given that at the last minute, at that last minute, no reasonable person would think that they had to get a check in the mail by midnight that night given the course of time. I think the more important question is not that he rejected it, but when he accepted it. When he accepted it. Well, then that gets us to the second fact issue that the Court resolves as a matter of law. On January 11, five days after Mr. Schmidt had been rendered quadriplegic in an accident, his wife wrote a check and put the date of the new term, January 5, on that check, and overnighted it to Gorslein within the 30-day period we're talking about. Well, it really doesn't matter whether she put January 5th on it. Let's assume she put January 11th on it. Well, that's actually the point I'm getting to. The Court below put great significance on that and ascribed some evil motive that that supported a — Well, forget the evil motive. Let's assume she sent the check on January 11th with the intent of renewing as of January 5th. That's what you — just as a matter of contract law, your position is what? That the offer remained open and can be accepted then? Right. There was an offer. There was an offer made that was open for 30 days. There was not an equivocal — an unequivocal rejection of the offer, and it was accepted within the 30-day period prior to any further notice that the offer had been withdrawn. Therefore, it was an accepted renewal. Do you want to save your time for rebuttal? Yes, sir. Please. If there are no other questions. Thank you. May it please the Court. William Roberts appellees certain underwriters at Lloyd's. And with the Court's permission, I'd like to take 15 minutes of the time and reserve five minutes for Ms. Jensen, who's for Gorsline. And as we actually have three key issues still at — still in this case. First, did Mr. Schmitt decline the offer of renewal of his policy and let it expire on its own terms on January 4th, which, of course, we've just discussed in some length? Second, was there sufficient evidence for the district court to grant underwriters motion for summary judgment? And third, was the district court correct in denying Mr. Schmitt's countermotion for summary judgment as being filed late? That third issue has not been addressed — addressed directly in the — in the pleadings or in the appellate briefs or in oral arguments so far. The — in his appellate brief, Mr. Schmitt takes the position that that was academic because the judge granted the motion — motion for — by underwriters. If it was academic at that point in time, and that — that issue was whether or not any of these Nevada statutes applied. If it was academic at that time, then I submit that it should also be academic before this honorable Court. As to the — to one issue that was raised at the outset by Mr. DeVries, that — that was that he — He rejected the offer. Rejected the policy. Rejected the offer. He rejected the offer. Why isn't that a disputed question of fact, when he says, I'll get in touch with you later about this? He has an offer for 30 days. He says, I don't yet have a contract, but I'll get in touch with you. Why — why isn't that a question of fact, whether that constitutes a rejection? In the overall — if you look at overall of the facts at that time, Your Honor, it's undisputed that he was advised on December 14th and again on January 3rd that the policy expired as of the 4th of January. It's also undisputed that he was aware of the requirement that in order to renew his policy, he had to submit Coruscant's Motorsport Renewal Form. And that's really quite important, because the original — Well, it's not undisputed that he had to return a form, that that was the only way to accept the policy. That's stated on the face of the — the January 3rd letter, where Mr. Gorslein advises him — That this is the only way to accept the offer? We can put this in force as you approve it. We just need the renewal proposal form completed and returned to us. Yeah. That's one way we can do it. Does it say that's the only way you can do it? It does not say it's the only way you can do it, Your Honor, but it's a — Then it's summary judgment. We're going to read everything most favorably to the other side, and — all right. I — Yes, Your Honor. He was — it is undisputed he was aware — aware that that was — You mean if he had sent in a check and said, I want to renew my policy, and hadn't returned that form, he wouldn't have a policy? The policy on the application, or as on the — on the communication in the form that he had to fill out, it also said that it was subject to underwriters' approval. I understand. They needed that form. But if he hadn't returned the form. Okay. If he hadn't returned the form — If he had sent in a check and said, I want my policy renewed — Underwriters would probably not have accepted that as — in the same way that they did — did not actually write the policy until after they'd received the original form, which was more complex. This form basically — they needed to confirm approximately how many races and what type of races he was going to be running that year, and also a confirmation that he — that he was in good health as he was — Right. But, I mean, under the usual course of dealing, what Gorslein would have done is to give him a binder, right? Yes. And he never asked for a binder. Oh, no, I know. I'm just — I'm just saying you're — you've got some different layers. But in the usual course of dealing, I think with anybody, but I think it was probably with this particular plaintiff as well, or insured, you have — he says he wants to renew. You issue a binder, and then you do the paperwork later. And you would not — you would not dispute coverage, even though the form hadn't been completed. I agree, Your Honor, that Mr. Gorslein would ask for a binder. But as — as was established, Mr. Gorslein did not have authority to bind under it. Well, that's a different question. The question is — that's an entirely different question. The question to me is, is this an offer that's valid for 30 days? It seems to me that it's not an unequivocal rejection. It's certainly not an acceptance, the fact's fact. So what's your position on the offer? Was it valid for 30 days or not? The quote was valid for 30 days. However, Your Honor, that was — that was Mr. Gorslein's statement in form. That was never authorized — authorized or approved by Lloyd's. Well, that's a question of fact, right? I mean, that's a factual question. If it's a valid offer for 30 days, then we just have to evaluate whether or not it's open and properly accepted in binding, right? And I don't know if we can — However — however, the Court determined there was sufficient evidence to determine that it was, in fact, an unequivocal rejection. And a rejection, of course, makes any offer void, regardless of whether it was stated — stated that it would reign open. There's no question. If it was an unequivocal rejection, that's — that's — you're right. And in the Court's ruling, on his finding on that issue, he noted that not only the failure to submit the Motorsports Renewal Form constituted clear evidence of that. He did nothing to secure the policy. It's certainly clear that he didn't accept. But why is it clear that by not returning something after a few days that you have 30 days to accept? Why is it clear that that's an unequivocal rejection? I think that's found, Your Honor, in the — in the statement itself that he did not have a contract to drive. Right. But it didn't say, and I — and I won't have a contract to drive. It said, I don't have one, and I'll get in touch with you. Yes, Your Honor. But this was — first, Mr. Schmitt was a sophisticated buyer of this insurance. That was evidenced by the negotiation he went through in the previous year on the specific contract provisions. It was also a fairly expensive policy. And that was also highlighted when he circled the amount of the premium. It had gone up from $14,000 to $17,800. That was due to the fact that in October he had an accident. And as of the time of January 3rd, he was still being paid disability payments for that accident. He had not yet been medically cleared to drive. Yeah, the doctor had cleared him as of January 15th to drive on that. And that's actually also a key point. He didn't have a contract. Why should he want to pay an expensive premium of well over $1,000 a month for a period that he wouldn't necessarily need it? He had a long-term relationship with Mr. Gorslein, and he knew he could start that policy again. Suppose he had gotten a contract on January 20th. Pardon? Suppose he had gotten a contract on January 20th. Wouldn't he then have wanted to reinstate or to accept the offer? Yes, he would. Yes, he would. And it could have been done very quickly at that time, because he would also have been cleared to drive. The — but he didn't have a contract at that time. The — and he said that. Yes. When he went to Orlando, it's unclear whether that was the case. What I'm asking is why is it an unequivocal rejection simply because somebody says it's the beginning of a 30-day period, you know, I don't have a contract, so I'm not accepting now, but I'll call you? Why is that saying, and I'm not going to accept it any time within the 30-day period? The — I think also because it says, sorry, John. You know, that is the lead-in in words he has. He has a good business relationship with Mr. Gorslein, and he's telling him, you know, he has a good business relationship with Mr. Gorslein. He also — he also — this was the very beginning of the race season. The first race of the season would be in the end of January. And that — he was injured the previous year in the last race of the season, in October. There are only a limited number, obviously, of race car driver positions to be filled. Those can only — only happen — happen and be filled up presumably in January or maybe — maybe slowly into February. He would not necessarily anticipate a further contract if he didn't have one by then unless another driver was injured or fired. But all of that's — all of that's nuance, in a sense. We're at summary judgment. We draw all the inferences in favor of the plaintiff, the nonmoving party. And here you have a — a slightly ambiguous fact. It's certainly not an acceptance. I think that's — that's clear. Is it a rejection? I don't know. It says, we'll get back to you. To me, that's ambiguous. And you — and at summary judgment, you may well prevail on that at trial. But it seems to me at summary judgment, that's a — that's a question of fact. Yes, Your Honor. Although in this case, there is an additional issue that — that I would invite the Court's attention to, and that is this was not going to be a jury trial. This was a bench trial. It would be — would be conducted by Judge Dawson, who was the same one in five days. That doesn't change our analysis, though, does it? Well, except that — that presumably Judge Dawson believed that at that time, he certainly had all the evidence he needed to make that ruling, rather than sitting through a three-day trial to hear the same evidence. But really, I guess at the end of the day, it comes down to — your position comes down to that facts and whether or not that's an unequivocal rejection, right? Yes, Your Honor, it does. As to the — to the other two issues, clearly, there was sufficient evidence for the district court to grant — grant their motion of summary judgment, given the fact that the judge had already ruled that it was, in fact, a — a rejection of the offer. As far as the — the issue on Nevada law, Mr. Vrees has said that Underwriters has — does not believe they're subject to Nevada regulations. That's absolutely not true, and we have never said that. Underwriters accepts that they are — are subject to Nevada statutes on insurance, which apply to them. And that is primarily in the — in Sections 685, etc., which deals with surplus lines policies, policies which Mr. DeVries has argued are primarily a health insurance policy. That's 689, etc. Most of the — and most of those provisions — now, this was not a health insurance policy, and, in fact, Lloyds was not admitted in Nevada and could not have written health insurance in Nevada because of that, because that is a — a limited to admitted carriers. This was a very specific policy of surplus lines, and as like most surplus lines policies, it's specifically designed to cover very unique, high, or special risks, which other carriers are not going to write. In that area, the Nevada legislature understands and has demonstrated that they understand that not all policies which have some aspects of health coverage fall under the rubric of a health insurance policy. Under NRS Section 681A020, this covers casualty insurance. They state provisions of medical, hospital, surgical, and funeral benefits and of coverage against accidental death and injury as incidental to and part of other insurance, as stated in various paragraphs. Subsection 1 — of Subsection 1, shall for all purposes be deemed to be the kind of insurance to which it is so incidental and not — and is not subject to provisions of this Code applicable to life and health. This Code section does — does not address surplus lines because it's addressing other forms of admitted coverage. But I use it only for example, that — that the Nevada legislature is aware that not — that health insurance provisions in the Code deal with health insurance itself and not with other programs such as that, or — and not with where ancillary health provisions such as are here for disability or injuries from accident or sickness which takes them out of the coverage. It's presumably a mere handful of possible Nevada residents would — would ever require this coverage. No admitted carrier would write this coverage, and therefore, it could be exported and was subject to 685, but would not be subject to 689 or the provisions of 687, which — which Mr. DeVries has also cited. 687 is for — for policies which have been submitted and approved by the Commissioner. That is for admitted policies and admitted carriers only. Are your policies, the surplus line policies, subject to disapproval by the Commissioner? There's no provision in 685 that they be submitted for approval. Obviously, if — if it came to the — to the Commissioner's attention, they — attention that there was something untoward or fraudulent, I — I presume that they would be able to disapprove it. Because the statute, it's — you know, says that it — that these sections apply to all contracts of insurance, the general terms of which are required to be approved or are subject to disapproval by the Commissioner. I just wondered what that was — meant in Nevada. It would seem to me probably all insurance policies would be subject to disapproval. Absent some notice of what the policy provisions were, again, these are not submitted to the Commissioner. No, no. It doesn't say that. Yes. But if it — is it subject to disapproval? And if it is, then it seems to me the other policies, not only those that are required to be approved, but all others as well. Again, Your Honor, there's no provision in 685 governing surplus lines that states that — that they — that they are subject to disapproval. So I would be happy to brief that to the Court — Court if you would like at a future date. But I don't know the answer to that. Okay. Thank you. Thank you, Your Honor. Do you have no further questions? I note that the time has expired. I'd like to have the adults with more questions. No, it hasn't expired. It hasn't. You still have about four minutes. I'm Jan Jensen with Laxalt & Nemer on behalf of the third-party defendants John Gorsline and the Gorsline Company. I'd like to just focus on two issues that I feel from the Court's questions you have some question about. First is putting that January 3rd fax transmittal into context. The Court was not just given Mr. Schmidt's report or reply, sorry, John. It was also given Mr. Schmidt's own testimony that he saw and understood the facts. He knew his insurance was expiring in two days. He knew it said or interpreted to say, send me a check or you're not covered. All of those go to the fact that Mr. Schmidt knew that the first policy was, in fact, expiring. So then we turn to whether or not there was a renewal and an open offer to renew for 30 days. Mr. Schmidt never contacted Mr. Gorsline indicating he wanted the coverage. He testified he never told John Gorsline he wanted coverage for the 2000 season. So if we accept the fact that this quote language, which my client contends was a price quote that we try to hold this price open for you on the same terms for 30 days, if it was open and Mr. Schmidt had not rejected it, he certainly had not accepted it before his accident. And that's a critical point here that I don't think we've addressed this morning, is even if we had an offer that was open, it cannot be accepted after the loss has been sustained. And there's clearly no evidence that there was any commitment. Excuse me, Your Honor. Why can't it be accepted? Under the known loss doctrine, Your Honor, that only risks can be insured. Events that have already occurred cannot be insured. Here, Lloyd's ---- Are there cases that say that when a renewal offer is open, that if you're injured while that offer is open, you're not covered? I'm not aware of any insurance-specific cases, but we have cited in the brief the known loss doctrine. And it's a fundamental premise of insurance law. I think as pointed out in Lloyd's brief, if that were not the case, any individual could go out and get repetitive quotes, never paying a premium, and then only accept one after they've insured a loss. I'm not talking about someone who doesn't have insurance. I'm talking about someone who does have insurance. Whether when you do have insurance and you're in the period of renewal, whether that doctrine applies, whether you know of any cases on that. Your Honor, here I believe it is clear that the first policy, the 99 to 2,000 policy ---- I know what the facts are. I know that it's one policy and the question of another. Whether you have any cases where one policy is expired and there's a period for renewal with an offer. Yes, Your Honor. I believe we've cited two or three in our brief, one dealing with homeowner insurance with a fire, another dealing with an auto accident case. Yes, there is case law in the known loss doctrine that ---- Nevada law? It is not Nevada law. No, Your Honor. I would ---- Nevada law is very sparse in this area. But the general contract principles apply here that even if you interpret Mr. Gorslein's price quote as an open offer for 30 days, there is no indication that Mr. Schmidt accepted that offer before he was injured. Why do you say it's merely a price quote? I mean, I gather your position is that your client had full authority to extend an offer of insurance, right? No, Your Honor. Mr. Gorslein was an insurance broker acting on behalf of Mr. Schmidt. He had no binding authority. He had no underwriting ---- Well, how could he make that quote then? Pardon me? If he's ---- I mean, how could he make a quote for ---- He received authorization from Lloyds Broker, Europia, to provide this quote based upon the same terms as the last year, subject to underwriting information about Mr. Schmidt's condition and planned racing activities. Certainly, a driver who is disabled may present more of a risk to Lloyds than a driver who is in good health. And Lloyds knew from the October 1999 accident Mr. Schmidt was disabled and was drawing disability benefits. Right. So, but they extended the offer, or at least the authority, to your client to make a price quote with the knowledge of the disability. Subject to, as it states on the quote, underwriter's right to alter the terms before issuing the policy. So, but in the normal course, just so I'm clear on this, I mean, I have a sense of what happens. Let's assume no accident occurred. You get the check. At that point, you would have issued a binder for a temporary insurance, basically, for about 30 days, right? Mr. Gorslein would not have that authority. He would have to notify Lloyds Broker, I've received the premium, and Lloyds Broker ---- Sure. Lloyds would issue the binder. But that would be the normal course of events. Right. But Mr. Gorslein ---- I'm sorry. So then, for example, if the paperwork hadn't been received, the renewals proposal form, that's something that would occur in the normal course of evaluating it for underwriting purposes while you get the insurance in place, right? In the normal course. Yes. I believe if there had been an indication that the insurance was desired, wanted, please place it, it could have been done. Sure. With the details worked out later. But the important thing is the accident occurred before any of that took place. Yeah. Thank you. All right. Thank you. Mr. Gorslein. Thank you. I'd like to spend initially some time on the surplus lines issue raised by Lloyds Counsel. This was not a surplus lines policy. It was not sold as a surplus lines policy. The policy itself, page 92 of the excerpt, is titled, An Accident and Sickness Disability Income Insurance. It's issued as an individual policy to an individual, Mr. Schmidt, who may have had specific underwriting issues because of his occupation, which is no different than a disability policy issued to a concert pianist. Different risk, but very sensitive to NFL football players and whatever. So it doesn't make it somehow a surplus policy. The code section cited. Are you saying? I'm sorry? I think you're confusing surplus policy with surplus lines policy, right? Right. In other words, all I'm saying is this is a non-admitted carrier or a foreign insurer who is issuing an individual policy in the State of Nevada, and they're underwriting the risk. It doesn't take it out of the insurance regulations and statutes that apply to what is called health insurance under Nevada law, under a lot of States, including California, be considered accident and sickness insurance. But it doesn't take it out of, it doesn't exempt it from regulation under the health insurance Nevada statutes. And the statute actually says that. What it says is, is that under 685A-100, that insurance contracts procured as surplus lines coverage from unauthorized insurers are fully valid and enforceable and given recognition. But then under 685A-090, it says that with regard to surplus lines, that if those contracts are, those two statutes together, if they are accepted that way or sold that way, they are given the same effect as like contracts issued by authorized insurers. In other words, it's an accident and disability policy. It covers, it doesn't cover accidental death. It covers total disability, it covers temporary disability, and it covers medical payments that are due. So it is, it is covered under the health insurance definition. And further, as we briefed, there's a specific statute in Nevada that lists what is exempted from these statutes we've talked about. We've listed them. This is not one of them. It's not exempt from the statutes applicable to this type of insurance. And then I would like to spend the balance of my time just briefly addressing the known --" Scalia, I'm sorry? Scalia, which is 40 seconds. Forty seconds. Known loss doctrine, again, presumes, must presume that there was no insurance in effect at all under any condition when the loss occurred. This is typical of all insurance. Our own auto insurance --" Have you had a case that says the known loss doctrine doesn't apply when you have insurance and the issue is renewal? I have no case that has ever been raised that says that known loss applies where insurance is in force, because that's not where the doctrine applies. And I just want to close with this. This is because questions revolved around this, that somehow there was an unfairness. Our auto insurance, you don't call your broker and say, gee, it's coming up. Are you going to renew me? Because the burden is not placed on the insured to do that. It's placed on the insurer and the insurer's agent or authorized broker in this case to comply with notice requirements in anticipation of renewal. One day doesn't comply with anything, and it's their burden, not the insured's, to assure renewal offers and the like. And Mr. Schmidt had a right to rely on both the law and the conduct of Gorslang. Thank you. Thank you. Thank you all. Case J3 will be submitted. The next case for argument is Flying J v. Pistachio.
judges: Reinhardt, Rymer, Thomas